

FILED

AUG 2 4 2011

U.S. COURT OF
FEDERAL CLAIMS

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RAMONA TWO SHIELDS AND
MARY LOUISE DEFENDER WILSON
individually, and on behalf of others
similarly situated,

        Plaintiffs,

v.

THE UNITED STATES OF AMERICA

        Defendant.

No. **11-531 L**

## CLASS ACTION COMPLAINT

Plaintiffs Ramona Two Shields and Mary Louise Defender Wilson, file this action individually, and on behalf of others similarly situated, seeking damages against the United States of America for breach of fiduciary duty:

- Between 2006 and 2009, the Fort Berthold Indian Reservation in North Dakota was in the very center – a "sweet spot" – of development of the huge Bakken oil shale formation with reserves estimated as high as 20 billion barrels.

- The Bureau of Indian Affairs ("BIA") has a fiduciary obligation that requires it to <u>only</u> approve oil and gas leases for individual Native American mineral owners on the Fort Berthold Reservation <u>if</u> the lease terms are in the economic "best interest" of those lessors.

- Yet during this time the BIA systematically "rubberstamped" individually owned leases for 42,500 mineral interest acres on Fort Berthold for a bonus of as little as $35 per acre.

- In stark contrast, Williams Companies paid what amounts to a bonus of $10,000 per acre to acquire those exact same leases in a $925 million resale in 2010.

- This real market value showed a complete and systemic breakdown of the BIA's fiduciary duty and a complete rip-off of Native American landowners.

# I.

## Parties

1.      Plaintiffs and Class Members are members and/or descendants of members of the Three Affiliated Tribes, a Native American Group based on the Fort Berthold Reservation, which is located in western North Dakota. The Three Affiliated Tribes is the collective reference and name of the Mandan, Hidatsa, and Arikara Nations who were brought together by hardship, disease, and forced relocations by the United States government in the nineteenth century.

2.      Ramona Two Shields is a member of the Three Affiliated Tribes who resides in Parshall, North Dakota. She is an owner and heir to trust Allotments 651A and M 868A, which are located on the Fort Berthold Reservation that the United States Government manages for her benefit.

3.      Members of other Native American Tribes also have inherited ownership interests in allotted trust lands on the Fort Berthold Reservation, including Mary Louise Defender Wilson, a member of the Standing Rock Sioux Tribe who resides in rural Porcupine, North Dakota. She is an owner and heir to trust Allotment M 868A, which is located on the Fort Berthold Reservation that the United States Government manages for her benefit.

4.      Defendant is the United States of America, acting through the Department of Interior, including the BIA, and other federal agencies, departments, bureaus, and offices. Defendant is charged with a fiduciary duty to manage, protect, and approve oil and gas leases on allotted trust lands located on the Fort Berthold Reservation. The Assistant Secretary of the Interior for Indian Affairs is specifically charged with "the management of all Indian affairs and of all matters arising out of Indian relations" under 25 U.S.C. § 2.

## II.

### Jurisdiction and Venue

5.     Pursuant to the Little Tucker Act, 28 U.S.C. § 1501, this Court has jurisdiction over plaintiffs' claims because they are brought under the laws of the United States, including the Mineral Leasing Act of 1938, 25 U.S.C. § 396, other regulations cited below, and federal common law.

6.     Venue in this Court is proper because the Little Tucker Act requires all money damage suits brought by Native Americans against the United States Government to be filed in the United States Court of Federal Claims.

## III.

### Facts

7.     This case focuses on a new version of a very old story: misappropriation of land resources belonging to Native Americans.   Present circumstances confirm what history has repeatedly shown: the bigger the prize, the more egregious  been the land grab.

**A.     The Government's Refusal to Stop the Exploitation of Oil and Gas Rights on the Fort Berthold Reservation**

8.     The prize today is huge:  a vast amount of oil that has been recently discovered in the Bakken Formation, which is located in the Williston Basin in North Dakota and surrounding area.  The U.S. Geological Survey has estimated 4 billion barrels of oil in the Bakken Formation, a likely underestimation.  A more recent industry company estimate is 20 billion barrels of oil. To put this in perspective, the reserves in the Bakken Formation may be greater than all the oil reserves in the State of Texas.

9.     A key "sweet spot" in the Bakken Formation falls right below the lands of the Fort Berthold Reservation.



10.     The egregious, modern-day land grab that is the subject of this lawsuit worked as follows:

        a.     Beginning around 2005 or 2006 and continuing over the next several years, a group of oil and gas speculators, which included a company called "Dakota 3," quickly obtained approximately 85,000 mineral acres of leases on the Fort Berthold Reservation, about half of which belong to <u>individual</u> Native Americans with what are called "allotted" trust land mineral interests.   The U.S. government has historically allotted to individual members of the Affiliated Tribes part of the land previously held in trust for the tribes as a whole.

        b.     With reported unemployment rates on the Fort Berthold Reservation above 40%, many (if not most) of the individual Native American "allottees" are poor and have absolutely no experience negotiating oil and gas leases.

        c.     These speculators induced individual Native American "allottees" to accept as low as $35 per acre – and/or as low as a 16 2/3 percent royalty interest – with

no control over the assignment of the leases and without other customary lease protections.

   d. These speculators took advantage of a 1999 amendment to the Mineral Leasing Act of 1938 that allowed them to get each lease from individual allottee lands with the approval of a simple majority of the mineral interest owners and the approval of the BIA.

   e. The BIA had the express fiduciary obligation under federal law to approve or disapprove the lease terms between a lessee oil and gas company and the lessor/allottee by applying a uniform "best interest" standard for individual Indian mineral owners of trust lands, as discussed below.

   f. In this role, the BIA officially "approved" these leases.  As evidence of this approval, the BIA literally rubber-stamped the following text on each lease:



This lease is in the best interest of the Indian mineral owner

11. Some members of the Three Affiliated Tribes complained to the BIA that the leasing prices being approved by the BIA were far too low.  This included a March 26, 2008 letter from the Fort Berthold MHA Elders Association to the BIA, which stated:

> **The BIA is allowing these lucrative agreements between oil companies and the BIA … knowing that it was not fair market value…. The Bureau of Indian Affairs and the Office of Trust Services have failed in their fiduciary responsibilities to the enrolled members of the tribe.**

12.     The BIA never responded to this letter.  Instead, it continued to systematically approve leases at rates and on terms below market, in breach of its fiduciary duties to the allottee mineral interest owners.  This allowed the oil and gas speculators to complete their leasing effort to corner the market on allottee land located on the Fort Berthold Indian Reservation.

13.     Apparently without any serious questioning, the BIA systematically approved the subsequent flipping of these leases in the form of assignments from many of the original lessors, using BIA-approved forms that did not require allottee approval even though federal regulations allowed for allottee approval.  The Native American owners of the oil and gas leases received no benefit from the flipping.  Customarily, Native American owners get more compensation from lessors and more control over the drilling if they have a voice in  whether a new drilling company gets assigned an existing lease.

14.     Recognizing how unfair this flipping process was to allottees, the governing body of the Three Affiliated Tribes urged the BIA to change its oil and gas lease form to require allottee consent, and to mandate that lessees share part of the consideration from the "flip" with allottees prior to approving the assignment of any oil and gas lease on the Fort Berthold Reservation.  Indeed, on August 1, 2008, the Governing Body of the Three Affiliated Tribes of the Fort Berthold Indian Reservation passed a Resolution that noted:

> WHEREAS, the Three Affiliated Tribes has become aware of the possibility of the assignment or "flipping" of allottee mineral leases without the consent of the Allottee Mineral Owners and with little or no additional compensation to the Allottee Mineral Owners; and
>
> WHEREAS, the Three Affiliated Tribes has already installed a provision regarding the assignment of tribal trust leases and wishes to provide the same level of protection to the Fort Berthold Allottee; and
>
> NOW, THEREFORE BE IT RESOLVED, that the Three Affiliated Tribes Tribal Business Council through this resolution hereby request the Bureau of Indian

Affairs – Fort Berthold Agency to amend the standard Oil and Gas Mining Lease for Fort Berthold to include the following provisions

(h)     Assignment of lease.  Except as provided herein, ***Lessee agrees that it shall not assign any interest in this Lease except*** (i) ***with the written consent of the Lessor***; (ii) with the approval of the Secretary of Interior; and (iii) for any consideration received by the Lessee for any assignment of any interest contained under the Lease, ***the Lessor shall be entitled to eighty percent (80%) of any additional consideration***. . . . .

15.     The BIA ignored this request.  As a result, Dakota 3 collected approximately 42,500 mineral interest acres through this leasing and flipping process.  The allottees had no say and received none of the financial benefit earned by those companies flipping their leases.

16.     On December 21, 2010, Williams Companies issued a press release effectively announcing to the world that the BIA, in disregard of its fiduciary obligations, had allowed allottees to be completely fleeced:

a.     Williams Companies paid Dakota 3 **$925 million** for the 85,000 acres of mineral leases on the Fort Berthold Reservation, plus a small number of producing wells.



# Williams Press Release

- ...announced today that it has completed a major purchase in North Dakota's Bakken oil play from private owners for **$925 million cash.** Williams announced the acquisition on Nov. 15.

- Williams estimates that Dakota-3's holdings represent approximately 185 million barrels of oil equivalent in total net reserves potential in the Middle Bakken and the Upper Three Forks formations.

b.     This amounted to approximately $10,000 per acre – not the $35 to $80 per acre lease bonus that many individual Indian mineral interest owners were paid.

17.     By systematically approving leases and assignments of approximately 42,500 mineral acres of the class members' individually allotted Indian trust land on the Fort Berthold Indian Reservation at undervalued rates, the United States Government failed to meet its fiduciary obligations to individual Indian mineral owners by violating the BIA's "best interest" guidelines for leasing Indian mineral rights on "trust" lands.

**B.     The Government's Historical Failure to Protect and Preserve Land on the Fort Berthold Reservation**

18.     The U.S. Government, acting through the BIA, should not be repeating the mistakes of history in the twenty-first century.

19.     All Americans owe the Three Affiliated Tribes a great debt, as their ancestors assisted and sheltered Meriwether Lewis and William Clark on their famed explorations.  Indeed, Sakakawea, who guided and interpreted for Lewis and Clark, was Hidatsa.  And a Mandan chief, Ankedoucharo (Eagle Feather), escorted Lewis and Clark back to Washington, D.C., upon their return passage, where he died and was buried in Richmond, Virginia.

20.     Yet the entire history of the Three Affiliated Tribes is one of Native Americans whose life and lands have been undermined by hardship, disease, and forced relocations by the United States Government.  At the heart of this exploitation has been an unbroken history of "land grabs" assisted by the Federal Government.

21.     Historically, the territorial lands of the Three Affiliated Tribes comprised an area of more than 12 million acres, extending from east of the Missouri River into Montana.  Two hundred years later, the lands of the Fort Berthold Reservation at issue here are a small fraction

of those original 12 million acres – a relatively thin strip of land on both sides of the Missouri River, including parts of Dunn, McKenzie, McLean, and Mountrail counties.

22.     The Bakken Formation land grab is only the latest chapter in a series of tales of government mismanagement or outright abuse regarding the members of the Three Affiliated Tribes.

23.     The initial territory recognized by the United States for the Three Affiliated Tribes was established within the Treaty of Fort Laramie of 1851.  By Executive Order in 1870, President Grant set apart the lands constituting the Fort Berthold Reservation for the Three Affiliated Tribes.

24.     First came the railroads. To accommodate railroad expansion, by Executive Order in 1880, President Hayes returned nearly 1.2 million acres of the Fort Berthold Reservation to the public domain, and exchanged a smaller, less desirable tract.

25.     Then came the settlers.  In 1886, the Three Affiliated Tribes relinquished over 1.6 million acres of the Fort Berthold Reservation – nearly two-thirds of the existing acreage – to the United States to accommodate settler expansion.

26.     With land remaining in the Fort Berthold Reservation totaling less than 1 million acres at this point, the land was allotted to individual members of the Three Affiliated Tribes according to the General Allotment Act of 1887 (also known as the Dawes Act).   With the Dawes Act, Congress created allotments of all Indian land, which the United States would hold in trust for 25 years for the benefit of the Three Affiliated Tribes and other Indian nations.  By the terms of the Indian Reorganization Act of 1934 (also known as the Wheeler-Howard Act), Congress extended the trust period for existing Indian allotments indefinitely.

27.    Next came the farmers and ranchers. By Act of Congress in 1910, further allotments were made, and then still more lands went out of ownership of the Three Affiliated Tribes, particularly with respect to reservation lands to the north and east of the Missouri River.

28.    Last, until now, came the powerful economic interests requiring a dam to control and direct the precious waters of the Missouri River. In 1954, the Three Affiliated Tribes lost an additional 152,000 acres of prime land – over one-quarter of their already diminished land base – when the United States erected the Garrison Dam and Reservoir on the Missouri River below the Fort Berthold Reservation.

29.    The flooding and filling of the Garrison Reservoir by the newly built Garrison Dam drove many tribal families off of their lands, in action overseen by the United States to accommodate flood control and irrigation needs of the business and agricultural industry outside the lands of the Three Affiliated Tribes. As a result, the individual members of the Three Affiliated Tribes were forced into far less desirable farming and ranching lands away from the Missouri River – the heart of their native homelands.

30.    These land grabs complete, the last valuable asset left to individual members of the Three Affiliated Tribes was their mineral interest rights in allotted trust lands on the Fort Berthold Reservation.

31.    Since 2000 – starting with the first massive discovery of oil in the Elm Coulee Field just over the border in Montana – it became apparent that the Bakken Formation, with the help of new fracking and horizontal drilling techniques, could produce billions of barrels of oil. The Fort Berthold Reservation sits right above the heart of that Bakken Formation.

32.    And now, once again, the U.S. Government – this time acting in combination with powerful oil and gas interests – has essentially "given away" those valuable mineral interests on

a systematic basis by approving grossly undervalued oil and gas leases that in many cases had bonus rentals of less than $100 per acre, and by allowing these leases to be flipped to other oil and gas companies without allottee approval or compensation to allottees. These terms were not in the best interest of the allottees.

33.     It is with respect to these lands that the United States has uniformly failed in its duties to the Indian landowners who have land holdings on the Fort Berthold Indian Reservation, and permitted outside business interests to exploit natural resources and inherent value that should accrue to the benefit of these long-suffering Native Americans.

34.     Given what is at stake in terms of billions of dollars of oil production revenues, this may well be the biggest of the rip-offs of individual Native Americans owning mineral interests on the Fort Berthold Reservation.

C.     **The BIA's Unique Supervisory Role in Leasing of Indian Mineral Lands**

35.     The "leasing" of Indian trust lands on reservations is dramatically different from normal "fee-simple-ownership" leasing by mineral interest owners in private property. Under the Indian Long-Term Leasing Act, 25 U.S.C. § 396 and corresponding federal regulations, the plaintiff class members are beholden to the BIA when it comes to signing oil and gas leases:

a.     Unlike a fee simple ownership lease, the BIA has ultimate management control over all aspects of the "trust lands" leasing process.

b.     The Indian Long-Term Leasing Act "places the Secretary of Interior at the center of the leasing of Indian lands. He determines whether to consent to a lease and the terms of the lease; he performs 'any and all acts' necessary to carry out the statute 'into full force and effect'; and he makes such rules and regulations as may be necessary to carry out the legislation." *Pawnee v. United States*, 830 F.2d 187, 189 (Fed. Cir. 1987).

c.   This includes BIA's control over every aspect of a lease, including:

o   creating the standardized lease form that must be used.

o   finalizing all the key terms of the lease regarding assignability, protection of land by lessees, the length of leases, and a number of other terms.

o   approving, or disapproving, the price terms and the royalty percentage of the trust fund "lease" of "allotted" Indian trust lands on the Fort Berthold Indian Reservation.

o   approving or disapproving any attempt to <u>assign</u> a lease from one lessee to another.

o   approving all lease rights over spacing – meaning that the BIA can insist on designating 160, 320, 640, 1280, or 2560 acre spacing (where larger spacing makes it easier for the oil company to keep the lease by just drilling one well).

o   receiving all "trust land" royalty payments and bonus payments for Indian allottees – and then as "middleman" sending the proper amount of royalty payments and bonus payments to the individual Indian owners of mineral interests in allotted Indian trust land.

o   holding – in the name of the U.S. Government – "legal title to the Indian mineral interest land, with the individual Indian "allotted trust land" mineral owner holding the 'beneficial interest."

d.   In turn, the Bureau of Indian Affairs has an <u>absolute fiduciary duty</u> obligation to "<u>maximize the economic interest</u>" of the individual Indian mineral owner at each step – including approval or disapproval of individual leases. This "best interest" standard is found in both statutory and promulgated agency regulations governing Indian trust land mineral leases. It makes the BIA's obligation that of a trustee – governed by common-law fiduciary principles that apply to any trustee of a trust, as well as by principles specific to the U.S. found in these government statutes and regulations.

**D.**   **Details of the Legal Standard Governing the BIA's Leasing Obligations**

36.   This legal standard is set forth in specific statutes and regulations as well as in federal common law.

     a.   Under Title 25, the Secretary of Interior must approve all oil and gas leases on allotted trust lands **before they are legally valid.**

     b.   25 C.F.R. Part 212.1 further underscores this strong standard of management conduct in its "Purpose and Scope" section:

> These regulations are intended to ensure that the Indian mineral owners desiring to have their resources developed are assured that they will be developed in a manner that **maximizes their best economic interests** and minimizes any adverse environmental impacts or cultural impacts resulting from such development.

     c.   25 C.F.R. 212.3 defines the BIA's "best interest standard":

> In the best interest of the Indian mineral owner refers to the standards to be applied by the Secretary in considering whether to take an administrative action affecting the interest of an Indian mineral owner.

     d.   In considering whether it is "in the best interest of the Indian mineral owner" to take a certain action (such as approval of lease, permit, unitization or communitization agreement), the Secretary shall consider any relevant factor, including, but not limited to:

- o   Economic considerations, such as date of lease expiration,
- o   Probable financial effect on the Indian mineral owner;
- o   Leasability of land concerned;
- o   Need for change in the terms of the existing lease;
- o   Marketability; and
- o   Potential environmental, social, and cultural effects.

e.     All federal agencies constitute trustees of tribes and allotted Indians. Consequently, the management of oil and gas – including oil and gas leases – are under the supervision of not only the Secretary of Interior, but others as well, including the Office of Surface Mining Reclamation and Enforcement (OSM), U.S. Bureau of Land Management (BLM), and the Minerals Management Service (MMS). 25 C.F.R. 212.5, 212.6; 43 C.F.R part 3160.

f.     "The total of these regulations is comprehensive, giving wide powers to Interior as to all aspects of the leasing arrangement." *Pawnee*, 830 F.2d at 189.

g.     In summary, specific statutes and regulations mandate that the federal government manage the leasing of allotted trust lands in the highest and best economic interest of Indian landowners.

## E.     The Simple Case for Systematic Breach of Fiduciary Duty

37.     There is a dramatic contrast between the BIA's obligations and its actual, systematic conduct. The simplest case – which is a virtual no-brainer – is that the BIA failed to compare the $35 to $500 an acre lease bonuses with much higher  prices that constituted fair value, and which were being agreed to on acreage surrounding the Fort Berthold Reservation. Instead, the BIA merely rubberstamped the bids from the oil companies that obtained these super-cheap leases.   The BIA did so knowing that many (if not most) allottees are poor, had no experience with leasing, and were glad to get a little money.

38.     Experts have known for decades that the Bakken Formation has massive oil reserves.  In the past decade the fracking technology to extract it has not only been perfected but also made economical.

39.     Bakken oil shale in the area was successfully produced using fracking techniques as early as 2000 – in the Elm Coulee Field not far from the Fort Berthold reservation.

40.     Production at Elm Coulee has more than doubled the oil output of the state of Montana between 2000 and 2006.

41.     By 2006, the potential of the Bakken Formation in the North Dakota and surrounding region was widely reported, and a respected technical paper estimated up to 300 billion barrels in the formation.  Even if 1% of that were recoverable, there would be 3 billion barrels of oil.

42.     In 2006, the Industrial Commission of the State of North Dakota issued a press release stating the Bakken Formation in North Dakota alone had 660 million barrels of probable reserves.

43.     By early 2008, the State of North Dakota had upped its estimates to 2 billion barrels of recoverable reserves  in North Dakota.  The U.S. Geological Survey had revised its estimates for the Bakken shale in the region  to around 4 billion barrels.

44.     The U.S. Bureau of Land Management by 2008 was approving Bakken oil shale leases for the Theodore Roosevelt National Park in North Dakota in the $3000 to $4000 per acre bonus rental range.  That is also not far from the Fort Berthold Reservation.

45.     By 2008 there were leases immediately adjoining the Fort Berthold Reservation that were going for as high as $3000 to $4000 per acre.

46.     Also by 2008 some government leases inside the Fort Berthold Reservation were going for as high as $3000 an acre.

47.     Not only were there existing "market yardsticks" the BIA could have used to negotiate better lease terms, but they were actually pointed out to the Bureau of Indian Affairs at the time of the rubberstamping. The BIA simply -- and systematically -- ignored them.

48.     One BIA superintendent – when pressed by a local landowners association group to have an "auction bid" process to establish a better value – briefly opened up bidding and got a $600 an acre bid from EOG Resources out of Houston. But then the BIA quickly closed down the open auction bidding and transferred the particular BIA superintendent to another Indian reservation. Then the BIA continued rubberstamping the cheap leases.

49.     The evidence becomes even more egregious. At one point, the BIA was presented with a $1000 an acre lease – and the BIA literally and consciously stuck it at the bottom of the pile of leases being approved, and continued rubber stamping all the below-market leases. The BIA official was somewhat incensed that the cheap leases were being challenged.

50.     The BIA's efforts on behalf of allottees varied dramatically from the government's effort to lease federal land. As noted earlier, the U.S. Bureau of Land Management was approving Bakken Formation leases bonuses in the Theodore Roosevelt National Park (less than 100 miles away) for $3,000 and $4,000 an acre during this time. As also noted earlier, the BIA approved leases of federal trust lands located within the Fort Berthold Reservation for lease bonuses that, in some cases, were thousands of dollars more per acre than what the BIA approved for allotted land on the Fort Berthold Reservation.

51.     In this case, on information and belief, the BIA's Denver office contained detailed Bakken Formation seismic date for the Fort Berthold Reservation, but did not share it with the general reservation population. There was one reported instance of a close personal relationship

between one BIA official tied to the leasing process and a landman for an oil company that was involved in the leasing process.

52.    There are more examples of systematic breaches of fiduciary duty by the BIA that have harmed the individual mineral interest holders of "allotted" trust lands on the Fort Berthold Reservation, including:

a.    Never pressing to get a uniform royalty interest substantially above 16 2/3 percent, when the government royalty rates onshore for Indian and federal lands runs as high as 33%.

b.    Never including written lease protections in the standard BIA lease form that prevented flipping or reassignment without landowner consent even though federal regulations allowed for landowner consent.

c.    Rubberstamping "flipping" reassignments of leases to new lessees that allowed Dakota 3 to roll up these leases and make $925 million – or $10,000 an acre, while individual Indian tribal members got less than one percent of the value.

d.    Allowing huge spacing by the lessees up to 2460 acres, so that the leases could be held indefinitely by drilling on one successful well.

e.    Building in no adequate environmental protections of the land against abuse by the lessee.

**F.    The Magnitude of the Potential Damages**

53.    Damages arise from these systematic breaches of fiduciary duties in three key respects.

54.    <u>First</u>, the BIA approved an inadequate lease bonus price for 42,500 acres of "individual" allotted mineral rights.  Approval at market rates would have generated hundreds of millions of dollars of additional revenues to Plaintiffs and Class Members.

55.    <u>Second</u>, the BIA approved inadequate royalty percentages of as low as 16 2/3 %, when market rates have been given at around 20%, which could go higher.  An increase of only 4% in royalty percentage over 16 2/3 % on each 100 million barrels of oil at $100 per barrel could mean billions of dollars.

56.    <u>Third</u>, the BIA approved inadequate terms of the leases, which has prevented the allottees from negotiating a much higher bonus price at an earlier period.

57.    The BIA also breached its fiduciary duties in a systematic fashion by:

(a)    not including written lease protections against "flipping" or reassignment of the oil and gas leases without allottee consent;

(b)    rubberstamping "flipping" assignments of leases to new lessees that allowed Dakota 3 to roll up certain class member leases and make $925 million – or $10,000 an acre – while certain individual class members received less than one percent of that value;

(c)    allowing these assignments to occur without requiring lessees to compensate allottees when the flipping occurred;

(d)    allowing unusually large spacing by lessees of up to 2460 acres, so that leases could be held indefinitely by drilling only one successful well; and

(e)    providing for no environmental protections of the land against abuse by lessees.  Each of these failures compounds the damages to Plaintiffs and the Class.

## IV.

## Class Action Allegations

58.     This action is properly maintainable as a class action pursuant to Rules 23(a) and

23(b)(2) and 23(b)(3) of the Rules of the United States Court of Federal Claims.

59.     *Class Definition.*  Plaintiffs bring this action on behalf of themselves and on

behalf of a class of persons who meet the following requirements:

    a.      Native Americans who own oil and gas mineral interests with respect to

approximately 42,500 mineral acres located on the Fort Berthold Indian Reservation;

    b.      Who entered into leases or assignments of leases with respect to such

acreage approved by the Bureau of Indian Affairs between January 1, 2006, and

November 1, 2010 (the Class Period); and

    c.      Whose leases were ultimately acquired by Williams Companies in 2010

by its acquisition of Dakota 3 E&P LLC.

    d.      Excluded from the Class are mineral interest owners who have been

officials, employees, or directors of any Williams, Dakota 3, or Zenergy, Inc. entity from

January 1, 2006, to the present.

60.     *Numerosity.* The Class is so numerous that joinder of all members is

impracticable.   During the Class Period, the BIA approved numerous leases pertaining to

approximately 42,500 mineral acres of the Class Members' individually allotted Indian trust land

on the Fort Berthold Reservation at undervalued terms.   As to any particular individually allotted

Indian trust land, there may be, and usually will be, more than one individual allottee with

respect to such land.   On information and belief, the number of Class Members will be in excess

of one thousand persons.

61.   *Manageability.*  Notwithstanding its size, the class is manageable. Members of the class are readily identifiable from BIA records, and once identified are easily reachable. No factual distinctions among individual claims will interfere with resolution of this action. Plaintiffs do not foresee any likely difficulties in managing this controversy as a class action.

62.   *Typicality.* The claims of the representative plaintiffs are typical of the claims of other Class Members, arise from the same course of conduct by Defendant, and are based on the same legal theory.  Plaintiffs and Class Members are similarly situated, assert jurisdiction under the same statute, allege the same statutory violation, and seek damages caused by the same events and courses of conduct.

63.   *Generally Applicable Government Action.*  The United States, through the BIA, has acted or refused to act in the same manner and on the same grounds generally applicable to Plaintiffs and the Class.  It systematically approved assignments and below-market oil and gas leases on behalf of the Plaintiffs and Class Members, in breach of fiduciary duties.

64.   *Fair and Adequate Representation.*  The named Plaintiffs are beneficiaries of the trust obligations at issue.  They have the same interests as the other Class Members, and will fairly and adequately protect the interests of the Class. Plaintiffs are committed to prosecuting this action, and have retained experienced counsel qualified in class action litigation that are competent to assert the interests of the Class.

a.   Plaintiff Ramona Two Shields, the lead representative plaintiff, is an enrolled member in the Three Affiliated Tribes who grew up on the Fort Berthold Reservation.  She spent thirty-four years as a career civil servant for the United States Navy, where she earned numerous commendations and worked her way to department head for the Navy's contracts and shipping branches.  Since her retirement from the

Navy, Plaintiff Two Shields has taken on various leadership roles on the Fort Berthold Reservation, including being elected as the Secretary/Treasurer of both the Fort Berthold MHA Elders Association and the largest allottee landowner's association on the Fort Berthold Indian Reservation. She is also a Board Member of the Prairie Public Television Station, a Representative for all tribes in the state of North Dakota on Silver Haired Legislative Assembly, and School Board Member for the Parshall School District in Parshall, North Dakota. She is an owner and heir to Allotments 651A and M 868A, which cover trust lands located on the Fort Berthold Reservation that the United States Government, as trustee, manages for her benefit. On December 19, 2007, the BIA approved a five-year oil and gas mining lease between the heirs of Allotment #651A and Zenergy Properties 6 Ft. Berthold Allottee, LLC for 320 acres, with a lease bonus of $451.48 per acre and a royalty rate of 18% of the value or amount of all oil, gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and saved from the leased land. On or about April 10, 2009, the BIA approved an Assignment of Oil and Gas Lease Record Title from Zenergy Properties 6 Ft. Berthold Allottee, LLC to Dakota-3 E&P Company, LLC. On April 8, 2008, the BIA approved a five-year oil and gas mining lease between the heirs of Allotment #M 868A and Zenergy Properties 5 Ft. Berthold Allottee L.L.C. for more than 314 acres, with a lease bonus of $400 per acre and a royalty rate of 18% of the value or amount of all oil, gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and saved from the leased land. On or about April 10, 2009, the BIA approved an Assignment of Oil and Gas Lease from Zenergy, Inc. to Dakota-3 E&P Company. As a consequence of the United States' breach of

fiduciary duty as alleged here, Plaintiff Two Shields has been damaged in an amount to be proven at trial.

b.      Plaintiff Mary Louise Defender Wilson is an enrolled member in the Standing Rock Sioux Tribe.  She is an owner and heir to Allotment M 868A, which covers trust lands located on the Fort Berthold Reservation that the United States Government, as trustee, manages for her benefit.  Her deceased husband is one of the World War II Navajo Code Talkers, and she has led a storied professional career working for: the BIA as a land officer in Pierre, South Dakota; Sen. Quentin Burdick as an aide in his Washington, D.C. office; the AFL-CIO; Winnipeg, Canada's Indian Center as Executive Director; an extended care facility for the elderly as acting administrator; the North Dakota Legislature as a senate aide; and the North Dakota State Hospital as director of cultural programming. She now teaches Dakota language courses at Sitting Bull College in Fort Yates, North Dakota.  She is an owner and heir to Allotment M 868A, which covers trust lands located on the Fort Berthold Reservation that the United States Government, as trustee, manages for her benefit.  On April 8, 2008, the BIA approved a five-year oil and gas mining lease between the heirs of Allotment # M 868A and Zenergy Properties 5 Ft. Berthold Allottee L.L.C. for more than 314 acres, with a lease bonus of $400 per acre and a royalty rate of 18% of the value or amount of all oil, gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and saved from the leased land.  On or about April 10, 2009, the BIA approved an Assignment of Oil and Gas Lease from Zenergy, Inc. to Dakota-3 E&P Company.  As a consequence of the United States' breach of fiduciary duty as alleged here, Plaintiff Wilson has been damaged in an amount to be proven at trial.

      c.     Counsel for plaintiffs are experienced in the substantive and procedural law in this case, have sufficient resources for the completion of this litigation, are not members of the class or related to members of the class, and do not have an economic stake in a positive outcome of this lawsuit beyond the potential recovery of attorney fees

      d.     Such counsel includes Ken McNeil, Shawn Raymond, and Charles Eskridge, each a partner at Susman Godfrey L.L.P. and experienced in high stakes, class-action litigation. Ken McNeil, a twenty-five year partner at Susman Godfrey LLP, has extensive experience in plaintiff class actions generally. He also has extensive experience in oil and gas-related litigation. He has also been lead trial attorney in very large energy litigation, including as outside counsel for one of the largest US-based energy companies. Shawn Raymond and Charles Eskridge (a former U.S. Supreme Court clerk) also have extensive experience in class action litigation and energy-related litigation. Such counsel also include Mario Gonzalez, a Native American attorney with vast experience in federal Indian law, including claims brought before the United States Court of Federal Claims. Mr. Gonzalez is recognized as one of the premier veteran Native American rights attorneys in the United States. Plaintiffs' counsel also includes William Delmore, a partner at Kelsch, Kelsch, Ruff & Kranda, who has experience energy related and environmental matters affecting Native American issues as both a government attorney and in private practice. And Plaintiffs' counsel includes John M. Olson, an experienced attorney who has also served in elective office, including two terms as State's Attorney for Burleigh County, North Dakota.

65.    *Common Questions Predominate*. Questions of law and fact common to Class Members predominate over any questions affecting only individual members.  Such questions common to the Class include, but are not limited to:

a.    The legal standards governing the fiduciary obligations of the United States regarding lease approval with respect to the approximately 42,500 mineral acres of individually owned allotted Indian Trust land on the Fort Berthold Reservation during the Class Period;

b.    The extent to which, if at all, the United States, through the BIA, has complied with its fiduciary obligations;

c.    The policy adopted by the BIA to evaluate mineral leases and assignments for approval on the Fort Berthold Reservation; and

d.    The extent to which, if at all, the United States, through the BIA, properly exercised its right to approve or disapprove the lease terms so as to maximize the best economic interests of Indian mineral owners of trust land.  *See* 25 C.F.R. Part 212.1; 25 C.F.R. § 212.3.

66.    *Superiority*.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons:

a.    Individual damages to most or all of the Class Members will be less than the amount of individual litigation expenses, making the expense of non-class litigation prohibitive or impractical for Class Members;

b.    Plaintiffs are unaware of any litigation concerning the controversy already begun by any other Class Members;

c.      No reason suggests that Class Members otherwise have an interest in individually controlling the prosecution of separate actions;

d.      Certifying this matter as a class action will serve the overall interests of justice by providing the most efficient and cost-effective method of resolving the lawsuit without duplicative litigation, while allaying concerns regarding statute of limitations or other concerns.

**Cause of Action**

**Breach of Fiduciary Duty**

67.     The plaintiffs incorporate the allegations above.

68.     Under the Indian Long-Term Leasing Act, 25 U.S.C. § 396 and corresponding federal regulations, the Class Members are beholden to the BIA when it comes to signing oil and gas leases.  As stated by the Federal Circuit in *Pawnee v. United States*, 830 F.2d 187, 189 (Fed. Cir. 1987), this statute:

> places the Secretary of Interior at the center of the leasing of Indian lands.  He determines whether to consent to a lease and the terms of the lease; he performs 'any and all acts' necessary to carry out the statute 'into full force and effect'; and he makes such rules and regulations as may be necessary to carry out the legislation.

The BIA, therefore, has ultimate management authority over all aspects of the leasing process and must act in the best interest of the class members.

69.     This management authority includes approving – or disapproving – the price terms, the length of the lease, the royalty percentage of the lease of allotted Indian trust lands on the Fort Berthold Reservation, and the terms of any assignment of the lease.  Indeed, no oil and gas lease involving allottees becomes legally valid without BIA approval:

> The Secretary [of Interior] may approve any mineral lease or agreement that affects individually owned Indian land if: (i) the owners of a majority of the undivided interest in the Indian land that is the subject of the mineral lease or

agreement … consent to the lease agreement; ***and*** (ii) the Secretary determines that approving the lease or agreement is in the best interest of the Indian owners of the Indian land…. Upon the approval of the Secretary [], the lease or agreement shall be binding, to the same extent as if all the Indian owners of the Indian land involved had consented to the lease or agreement.

25 U.S.C. § 396, 112 Stat. 620 (1998) (emphasis added).

70. In carrying out its duties, the BIA has a fiduciary duty to maximize the economic interests of the individual Indian mineral owner when deciding whether to approve or disapprove individual leases. 25 C.F.R. Part 212.1 underscores the exacting standard of management undertaken by the BIA:

These regulations are intended to ensure that the Indian mineral owners desiring to have their resources developed are assured that they will be developed in a manner that **maximizes their best economic interests** and minimizes any adverse environmental impacts or cultural impacts resulting from such development.

71. 25 C.F.R. § 212.3 defines the "best interest" standard:

In the best interest of the Indian mineral owner refers to the standards to be applied by the Secretary in considering whether to take an administrative action affecting the interest of an Indian mineral owner. In considering whether it is "in the best interest of the Indian mineral owner" to take a certain action (such as approval of lease, permit, unitization or communitization agreement), the Secretary shall consider any relevant factor, including, but not limited to: economic considerations, such as date of lease expiration, probable financial effect on the Indian mineral owner; leasability of land concerned; need for change in the terms of the existing lease; marketability; and potential environmental, social, and cultural effects.

72.     As the *Pawnee* court noted: "The total of these regulations is comprehensive, giving wide powers to the Interior as to all aspects of the leasing arrangement." 830 F.2d at 189. As a result, "The United States has a general fiduciary obligation toward the Indians with respect to the management of [allottees'] oil and gas leases." *Id.* at 190.

73.     With respect to the same statutes at issue in this case, the *Pawnee* court concluded:

> *Because the statutes and regulations at issue in this case clearly establish*
> *fiduciary obligations of the Government* in the management and operation of
> Indian lands and resources, they can fairly be interpreted as mandating
> compensation by the Federal Government for damages sustained.   Given the
> existence of the trust relationship, *it naturally follows that the Government*
> *should be liable for damages for the breach of its fiduciary duties*. It is well
> established that a trustee is accountable in damages for breach of trust.

*Id.* (emphasis added).

74.     A dramatic contrast exists between, on the one hand, the BIA's actual conduct and, on the other hand, its fiduciary obligations to the Plaintiffs and Class Members.

75.     The BIA failed to compare the per acre lease bonuses it approved with the much higher prices that could have been obtained.   As a result, Class Members received a below-market per acre bonus amount.

76.     Similarly, the BIA breached its fiduciary duties when it failed to secure a royalty interest above 18 percent, or to secure a lease term of less than five years.   As a result, Class Members received below-market royalty interest rates, and/or lease terms of unreasonable duration.

77.     The BIA also breached its fiduciary duties by: (a) not including written lease protections against "flipping" or reassignment of the oil and gas leases without allottee consent, (b) rubberstamping "flipping" assignments of leases to new lessees that allowed Dakota 3 to roll

up certain class member leases and make $925 million – $10,000 an acre for the mineral interest

leases – while certain individual class members received less than one percent of that value; (c)

allowing these assignments to occur without requiring lessees to compensate allottees when the

flipping occurred; and (d) allowing unusually large spacing by lessees of up to 2460 acres, so

that leases could be held indefinitely by drilling on one successful well.

78.     As a direct and proximate result of these breaches of duties of loyalty and care,

Plaintiffs and the Class Members suffered damages.

## VI.

## Prayer

Plaintiffs, on behalf of themselves and all others similarly situated, request the following

procedural orders and demand judgment against the Defendants, equitable relief and damages, as

follows:

a.      An order certifying the proposed Class, under Rule 23 of the Rules of the United States Court of Federal Claims, and appointing Plaintiffs and their counsel to represent the Class;

b.      A trial to be scheduled at the federal courthouse in Bismarck, North Dakota;

c.      Compensatory damages in an amount to be sufficient to compensate each Class Member for their losses;

d.      Consequential damages in an amount to be determined at trial;

e.      Costs and disbursements of the action;

f.      Reasonable attorneys' fees;

g.      Judgment against The United States in the amount of in excess of $400 million; and

h.      Such other and further relief as this Court may deem just and proper.

Dated this 24th day of August, 2011.

Respectfully submitted,

SUSMAN GODFREY L.L.P.

Kenneth E. McNeil
Shawn L. Raymond
Charles R. Eskridge
1000 Louisiana, Suite 5100
Houston, Texas  77002
Telephone:  713/651-9366
Facsimile:  713/654-6666
kmcneil@susmangodfrey.com
sraymond@susmangodfrey.com
ceskridge@susmangodfrey.com

*Attorneys for Plaintiffs
Ramona Two Shields and
Mary Louise Defender Wilson*

OF COUNSEL:

SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas  77002
Telephone:  713/651-9366
Facsimile:  713/654-6666
sraymond@susmangodfrey.com
ceskridge@susmangodfrey.com

Mario Gonzalez
GONZALEZ LAW FIRM
522 7th Street, Suite 202
Rapid City, SD  57701
Telephone:  605/716-6355
mario@mariogonzalezlaw.com

William J. Delmore
KELSCH KELSCH RUFF & KRANDA
103 Collins Avenue
P.O. Box 1266
Mandan, ND  58554-7266
Telephone:  701/663-9818
Facsimile:  701/663-9810
delmore@kelschlaw.com

John M. Olson
JOHN M. OLSON P.C.
418 E. Broadway Avenue #9
Bismarck, ND  58501-4086
Telephone:  701/222-3485
olsonpc@midconetwork.com